United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SANDRA FAVELA *et. al.*,

    Plaintiffs,

  v.

TARGET CORPORATION, and DOES 1-50 inclusive,

    Defendants.

No. C 3:04-cv-00895 WHA

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this employment-discrimination case, plaintiffs allege they were wrongfully terminated on the basis of race and national origin, in violation of Title VII and the Fair Employment and Housing Act. Defendant Target Corporation now moves for summary judgment on behalf of itself and the Doe defendants, its unnamed employees. Because the two remaining plaintiffs have failed to demonstrate that there remain triable issues of fact, this motion is **GRANTED**.[1]

---

[1] This action was commenced on December 4, 2003 by forty-five plaintiffs. Ten plaintiffs (Rogelio Ferrer, Luis Lopez Gamboa, Arturo Lopez, Filberto Chan May, Juan Munoz, Oliva Munoz Torres, Antonio Vasquez, Eloia Vasquez, Armando Velasco and Artemio Velasco) stipulated to dismissal of their claims on November 15, 2004. Another five plaintiffs (Maria del Carmen Delgadillo, Consuelo Ramirez Diaz, Estela Robles, Tanya Medrano Segovia and Laura Sierra) stipulated to dismissal of their claims on March 22, 2005. Most of the remaining plaintiffs (Elizabeth Alvarez, Elizabeth Morales Arcos, Maria Barajas, Carmen Barrera, Raul Alvarez Cruz, Veronica Gutierrez De Lopez, Sergio Delgadillo, Sandra Favela, Rocio Ginez, Araceli Gonzalez, Oliva Jimenez, Alejandra Lopez, Jose A. Lopez Lozano, Humberto Marquez, Carmela Rosas Montes, Norma Ortiz, Ana Oseguera, Anabel Martinez Ramirez, Feliman Ramirez, Maria Ramirez, Carmen Rodriquez, Pedro Arango Rosas, Mordoqueo Herrera Sosa, Moises Vasquez, Ricardo Vasquez, Thelma EK Yam and Pedro Tovar Zepeda) stipulated to dismissal of their claims on May 9, 2005.

**STATEMENT**

The forty-five plaintiffs who filed suit are all recent immigrants from Mexico and former employees of three Target Stores located in Rohnert Park, Walnut Creek and Pinole, California (Compl. ¶¶ 9–11). This motion for summary judgment is directed to the two remaining plaintiffs: Maria Carmen Fausto Gonzalez and Cecilia Martinez. Plaintiffs' complaint alleges that they were discriminated against because of their race or national origin in violation of Title VII (42 U.S.C. 2000e-2) and FEHA (California Gov't Code §12940).[2] They allege they were wrongfully terminated by defendants upon Target's receipt of a "no match" list from the Social Security Administration ("SSA"), which indicated that the personal information plaintiffs submitted on their W-2 forms was not consistent with the official records for those social security numbers (*id.* ¶¶ 13–14).

Target counters that its policy of terminating employees who could not resolve the discrepancy with their proffered social security numbers was non-discriminatory. Moreover, to the extent that it may have had a disparate impact on Hispanics, Target argues that it was a side-effect of the SSA's "no match" list rather than any of its own employment practices.

Since 1997, Target has participated in an SSA program called Employment Verification Service ("EVS"), designed to ensure that social security contributions, both those withheld from employee wages and those paid by the employer, are credited to the correct employee account (Ereth Decl. ¶ 3). In January 2003, Target had been audited by the Internal Revenue Service for past problems with the proper allocation of social security withholdings and contributions; participating in this program was one way for Target to demonstrate that it took reasonable steps to ensure proper crediting of contributions and avoid being fined (*id.* ¶ 4). On September 10, 2002, Target's Manager of Payroll Compliance, Todd Ereth, sent the SSA a cartridge with the information provided by its employees and the requisite EVS forms (*id.* ¶ 5).

In October 2002, Target received the "no match" list, indicating there were discrepancies for 128 employees between the information they had submitted at the time of hire

---

[2] Although the complaint also referred to 42 U.S.C. 2000d, prohibiting discrimination under Federally assisted programs, this section is inapplicable here. This order assumes that plaintiffs only intended to plead a violation of 42 U.S.C. 2000e-2, which prohibits unlawful employment practices.

2

and the information the SSA had in its records (*id.* ¶ 6). This list did not include any information identifying an individual's race or national origin; only the name, Target employee number, reported social security number, sex and date of birth for each employee were reflected on the list (*id.* ¶ 7).³ The three stores at Rohnert Park, Walnut Creek and Pinole were each sent the portion of the list pertaining to the employees at that location, along with instructions describing possible sources of discrepancy and how they could be resolved (*id.* ¶ 8, Exh. A).⁴

Nancy Williams, the Regional Human Resources Manager for the three stores decided that employees who could not resolve the discrepancy in their reported social security information would be terminated (Williams Decl. ¶ 6). This decision was based on a desire to avoid IRS fines, as described above, as well as a concern that an employee's intentional presentation of false social security information at the time of hire would be an independent grounds for termination, as a violation of Target's Honesty Policy (*id.* ¶ 5, Exh. A). She asserts that race and national origin were not factors considered (*id.* ¶ 9).

Ms. Williams instructed the human resources representative at each store, (*i.e.*, the Executive Team Leader-Team Relations or ETL-TR), to inform employees who had appeared on the "no match" list that they would be terminated if they could not resolve the discrepancy described in the "no match" list by a given deadline (*id.* ¶ 7). She further authorized the re-hire of any employee who could not resolve the discrepancy within the allotted time, but was able to do so within thirty days of termination (*id.* ¶ 8). Although Target had received similar "no match" lists from the SSA in the past, none of the plaintiffs had previously appeared on the list; if they had, Target asserts it would have enforced the same policy of requiring employees to resolve the discrepancy or face termination (*id.* ¶ 11).

---

³ The "no match" lists for the Rohnert Park, Walnut Creek and Pinole stores are appended as exhibits to the Sigala, Coghlan and Kroon declarations, respectively.

⁴ For example, if a female mistakenly indicated on her employment application that she was male, but the SSA's records indicated that the reported social security number belonging to a female, the discrepancy could be resolved by simply correcting the information recorded in Target's system. On the other hand, if a male employee had submitted a social security number that, according to the SSA's records, belonged to a female, he would have to go to the nearest SSA office and provide Target with proof that the discrepancy had been resolved. Likewise, if there had been a mere transposition of digits in the employee's social security number or date of birth, either Target's records or the SSA's records would need to be corrected.

1    Starting in late November and early December 2002, Michael Sigala, ETL-TR at the
Rohnert Park store, notified the thirty-seven employees on his portion of the "no match" list of
their need to resolve the discrepancy or face termination, using a Spanish-speaking interpreter
whenever necessary (Sigala Decl. ¶¶ 5–6). The employees were initially given until January 15,
2003, in order to delay the possible termination of a large number of employees until after the
busy holiday season, but the deadline was subsequently advanced to January 6, 2003 (*id.*
¶¶ 8–9). Two employees, one of whom was Hispanic, were able to resolve the discrepancy and
both were retained by Target (*id.* ¶ 10). All employees who were unable to resolve the
discrepancy on the "no match" list were terminated regardless of race or national origin; he also
asserted that no employee was fired because he or she was Hispanic (*id.* ¶¶ 11–13).

At around the same time, Suzanne Coghlan, ETL-TR at the Walnut Creek store,
addressed the seventy-three employees on her portion of the "no match" list by holding two
group meetings, followed by one-on-one meetings with each employee, with the assistance of
an interpreter if necessary (Coghlan Decl. ¶ 3–8). Although each employee was given two
weeks to resolve the discrepancy, it was not possible to meet with all seventy-three individuals
on the same day; thus, three different deadlines were scheduled, all after Christmas, in
anticipation of the busy holiday season (*id.* ¶¶ 7, 9–10). Employees who admitted during the
one-on-one meeting that they were unable to resolve the discrepancy were terminated at that
time, while others were terminated when they were unable to do so by their designated
deadlines, regardless of race or national origin (*id.* ¶¶ 12–13, 15–18). Twenty employees,
thirteen of whom were Hispanic, successfully resolved the discrepancy and were retained by
Target (*id.* ¶ 14).

The ETL-TR for the Pinole store, Carrie Kroon, also conducted one-on-one meetings
with the eighteen employees appearing on her portion of the "no match" list, with an interpreter
if necessary (Kroon Decl. ¶¶ 5–6). She also held a group meeting to explain that the
one-on-one meetings did not involve immigration services, as some employees feared (*id.* ¶ 7).
Employees who immediately admitted that they could not resolve the discrepancy were
terminated right away; those who did not resolve the discrepancy by their deadlines were also

4

terminated, regardless of race or national origin (*id.* ¶¶ 8–9, 12–13). Like the other stores, the deadlines had been scheduled for after Christmas (*id.* ¶ 10). Three employees, one of whom was Hispanic, resolved the discrepancy and were retained by Target (*id.* ¶ 11).

During the course of discovery, both Maria Carmen Fausto Gonzalez and Cecilia Martinez admitted that they were unable to resolve the discrepancy because they had provided false social security numbers to Target; both had purchased a social security number and resident alien card because they were undocumented at the time they were hired (*See* Wohl Decl. ¶ 3). Moreover, both testified that even if they had been given more time to resolve the discrepancy, they could not have done so because they were still not authorized to work in the United States (*ibid.*).[5]

The two remaining plaintiffs do not dispute that they were terminated because they had provided false documentation to Target and were unable to resolve the discrepancies in their social security information. Instead, they argue that this reason was pretextual because Target had a history of knowingly hiring undocumented workers; indeed, some of the original forty-five plaintiffs were re-hired a few months after they were terminated (Hubbs Exhs. E-H). Target acknowledges that some plaintiffs were re-hired by local managers despite the implementation of a more rigorous background check system in January 2003 (Williams Decl. ¶ 12).[6] Finally, plaintiffs point to various examples of alleged workplace discrimination against recent immigrants from Mexico, even by naturalized or American-born Hispanic supervisors (Hubbs Exhs. J-M).

## ANALYSIS

**1.   LEGAL STANDARD FOR SUMMARY JUDGMENT.**

Pursuant to FRCP 56(c), summary judgment is proper where the pleadings, discovery and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A genuine dispute as to a material fact exists if

---

[5] Relevant excerpts of plaintiffs' responses to interrogatories and requests for admissions as well as deposition testimony are appended as Exhibits 11-A, 11-B, 11-C, 16-A, 16-B and 16-C.

[6] Ms. Williams also explained that she herself would not have rehired any employee who had previously presented false documentation, but hiring decisions are made by local managers.

5

1  there is sufficient evidence for a reasonable trier of fact to return a verdict for the nonmoving
2  party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3  Once the moving party meets its initial burden of demonstrating the absence of any
4  genuine issues of material fact, the nonmoving party must "go beyond the pleadings by [its]
5  own affidavits, or by depositions, answers to interrogatories and admissions on file, designate
6  specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,
7  323–24 (1986) (internal quotations omitted). "Evidence of the nonmovant is to be believed and
8  all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Yet,
9  summary judgment for a defendant is appropriate when plaintiff fails to make a showing
10 sufficient to establish the existence of an element essential to that party's case, and on which
11 that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

### 2. DISPARATE TREATMENT.

13 The applicable legal framework for plaintiffs' allegations of employment discrimination
14 based on race and national origin was set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S.
15 792, 802–05 (1973).[7] To establish a *prima facie* case of discrimination, plaintiffs must
16 demonstrate that: (1) they belong to a protected class; (2) they were qualified for the position;
17 (3) they were subject to an adverse employment action; and (4) similarly situated individuals
18 outside the protected class were treated more favorably. The burden of production then shifts to
19 the employer to articulate some legitimate, nondiscriminatory reason. If the employer does so,
20 then the presumption of discrimination disappears and the plaintiff must show that the
21 articulated reason is pretextual by showing either that a discriminatory reason more likely
22 motivated the employer or that the proffered explanation is unworthy of credence. *Chuang v.*
23 *Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000).
24 Throughout this burden-shifting analysis, the ultimate burden of persuasion remains with the
25 employee. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

---

28 [7] Because Title VII and FEHA "operate under the same guiding principles," courts commonly analyze an employee's claims of discrimination brought under both statutes together. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 1998).

6

Before proceeding further, it is worth noting that Title VII and FEHA only prohibits discrimination on the basis of race, color, religion, sex or national origin. In contrast, it is not illegal to discriminate on the basis of citizenship or alienage. *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 95 (1973). Thus, it would be unlawful for an employer to discriminate by hiring aliens of Anglo-Saxon background but refusing to hire those of Mexican or Spanish ancestry. *Ibid.* But while Title VII protection also extends to undocumented aliens, the key question remains whether there was discrimination based on race or national origin. *Equal Employment Opportunity Comm'n v. Tortilleria "La Mejor,"* 758 F.Supp. 585, 590 (E.D. Cal. 1991).

### i. Plaintiffs' *Prima Facie* Case.

Actual proof of unlawful discrimination is unnecessary to establish a *prima facie* case; all a plaintiff must do is "raise an inference that such misconduct occurred." *Warren v. City of Carlsbad*, 58 F.3d 439, 442 (9th Cir. 1995). The requisite degree of proof necessary at summary-judgment is "minimal and does not even need to rise to the level of preponderance of the evidence." *Wallis v. J. R. Simplot Co.*, 26 F.3d 885, 889–90 (9th Cir. 1994).

This order expresses doubt that plaintiffs are able to meet their burden of demonstrating that similarly situated individuals outside the protected class were treated more favorably because every employee (whether Hispanic or non-Hispanic) who appeared on the SSA's "no match" list was required to resolve the discrepancy. Those who could, including fifteen Hispanic employees, were retained by Target. Everyone who could not resolve the discrepancy was terminated, regardless of race or national origin. Furthermore, many plaintiffs openly admitted that the employees hired by Target to replace them were also Hispanic, negating any inference that Target was intentionally discriminating against Hispanic employees.

Even so, this order continues with the burden-shifting analysis, assuming that a *prima facie* case has been established. Ultimately, this first step is insignificant because plaintiffs do not demonstrate that the nondiscriminatory reasons asserted by Target were merely pretextual.

### ii. Target's Proffered Legitimate, Nondiscriminatory Reasons.

Even assuming *arguendo*, however that plaintiffs have established a *prima facie* case of discrimination, Target has met its burden of producing legitimate, nondiscriminatory reasons for

7

1  terminating plaintiffs.  Target's first proffered reason for terminating plaintiffs was their failure
2  to resolve the discrepancy in their social security information, as reflected in the SSA's "no
3  match" list.  Target also asserts that the intentional falsification of work papers was a violation
4  of its Honesty Policy and an independent grounds for termination.

### iii. Evidence of Pretext.

In an attempt to demonstrate that Target's proffered reasons for termination were unworthy of credence, plaintiffs point to evidence that Target has a history of hiring unauthorized workers and that there was other evidence of discrimination aimed at undocumented immigrants from Mexico.  Even viewing everything in the light most favorable to plaintiffs, the evidence is insufficient to defeat summary judgment.

With respect to plaintiff's allegations that there were other pre-termination acts discrimination, this order notes that the only discriminatory act alleged in the complaint was termination following Target's receipt of the SSA's "no match" list.  Target's alleged failure to pay plaintiffs wages owed upon discharge is already the subject of another lawsuit (Wohl Exh. 33).  The other allegations, (*i.e.*, disparate treatment of and derogatory comments towards undocumented aliens from Mexico), have not been administratively exhausted and are not the subject of this lawsuit (*See* Wohl Exh. 32).  Regardless, discrimination based on citizenship or alienage would not be actionable under Title VII.  *Espinoza*, 414 U.S. at 95.

As for the allegation that Target has a history of hiring unauthorized workers, this raises an issue entirely separate from the question of discrimination based on race or national origin.  Put simply, plaintiffs assert that Target purposely hired undocumented aliens, then fired them only when they faced potential liability for doing so.  Yet, despite this different spin on the facts, plaintiffs essentially concede that Target was merely complying with the law.

Because employers are prohibited from knowingly hiring or continuing to employ unauthorized aliens pursuant to 8 U.S.C. 1324a, it is "a government-imposed employment qualification" that employees must be either citizens or resident aliens authorized to work.  *Murillo v. Rite Stuff Foods, Inc.*, 77 Cal.Rptr.2d 12, 19 (Cal. App. 2d Dist. 1998).  As plaintiffs point out, Target would face no liability if employees had presented false documents that

1  reasonably appeared to be genuine.  8 U.S.C. 1324a(b)(1)(A).  But once Target was placed on
2  notice by the SSA's "no match" list that some of its employees were possibly undocumented
3  workers, it was obligated to verify that those employees were indeed authorized to work in the
4  United States.

5  While it would have been a different story had Target arbitrarily fired everyone who
6  appeared on the "no match" list, that was not the case here.  In the words of the Immigration
7  and Naturalization Service itself, "if an employee has been given the opportunity for wage
8  reporting purposes to explain and reconcile a reported discrepancy with SSA records, and has
9  failed to do so satisfactorily, that is an entirely different situation from an initial SSA notice
10 standing alone" (Wohl Exh. 34 at 2).  Here, all employees appearing on the "no match" list
11 were asked to resolve the discrepancy or face termination.  Both remaining plaintiffs have
12 admitted that they bought fake social security and resident alien cards to present to Target at the
13 time they were hired.  That they could not resolve the discrepancy in their social security
14 records, or otherwise prove that they were authorized to work, was a legitimate reason for their
15 termination.

16 To be sure, the Court does not condone Target's behavior in turning a semi-blind eye to
17 the immigration status of undocumented aliens during the hiring process (if plaintiffs'
18 allegations are true), but subsequently firing employees on the basis that they are not authorized
19 to work in the United States would not constitute a violation of Title VII or FEHA.  There is no
20 evidence in the summary-judgment record to support a finding of intentional discrimination on
21 the basis of race or national origin.  No reasonable finder of fact could conclude otherwise.

22 **3.    DISPARATE IMPACT.**

23 To establish a *prima facie* case of disparate impact, plaintiffs must not only show that
24 there are statistical disparities in the employer's work force, but must also identify the specific
25 employment practice that is challenged.  (Disparate impact challenges typically arise in the
26 context of standardized tests for employment or promotion.)  Causation must also be proved; in
27 other words, plaintiffs must offer statistical evidence of a kind and degree sufficient to show
28 that the challenged employment practice has caused the exclusion of applicants for jobs or

9

1  promotions because of their membership in a protected group.  *Watson v. Fort Worth Bank and
2  Trust*, 487 U.S. 977, 994-995 (1988).

3       Here, plaintiffs have not met their burden.  To the extent that a disproportionate number of Hispanics appeared on the SSA's "no match" list, Target correctly argues that it was not responsible for that statistical disparity.  All employees who appeared on the list were required to resolve the discrepancy.  There is no allegation (or proof) that Target's process of asking employees to resolve the discrepancy had a disparate impact on Hispanics, especially since Spanish-speaking interpreters assisted whenever necessary.  Even if there was a disparate impact on undocumented aliens (who have since all admitted that they falsified their work papers), the law does not prohibit discrimination on the basis of citizenship or alienage, as discussed above.

## CONCLUSION

For the aforementioned reasons, the motion for summary judgment is **GRANTED**.  In light of this ruling, this order declines to reach Target's alternative motion for partial summary judgment on the issue of whether plaintiffs would have otherwise been precluded from back pay anyway, pursuant to the after-acquired evidence doctrine.  Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated:  May 10, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California